**GLADIOLA BISCUIT COMPANY,**
Appellant,

v.

**SOUTHERN ICE COMPANY, Appellee.**
No. 17513.

United States Court of Appeals
Fifth Circuit.
May 27, 1959.

C. H. Gillespie, Jr., Sherman, Tex., Gillespie, Gillespie & Robinson, Sherman, Tex., for appellant.

J. Edwin Fleming, Patrick B. Gibbons, III, Coke & Coke, Dallas, Tex., for appellee.

Before HUTCHESON, Chief Judge, and BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The decisive question here is whether the liability without fault imposed by Texas on a manufacturer of food stuff for injuries sustained by one who consumes it applies to damages sustained by a middleman-processor who uses the manufactured deleterious product as an ingredient in an entirely different article intended and sold for human consumption.

■ Treating it entirely as a matter of law and expressly holding that the facts were sufficient to sustain the jury's verdict for the plaintiff-middleman if those implied findings would, in turn, support a judgment, the District Court granted the manufacturer's motion for j. n. o. v. Glass in a frozen biscuit being packaged would, the Court recognized, give rise to liability under Jacob E. Decker & Sons, Inc. v. Capps, 1942, 139 Tex. 609, 164 S.W.2d 828, 142 A.L.R. 1479, to one who ate the biscuits. But the Court held it would not impose liability to a processor of frozen dough whose like duty to biscuit-eater customers required that it not put glassy dough in the channels of commerce. Gladiola Biscuit Co. v. Southern Ice Co., D.C.E.D. Tex.1958, 163 F.Supp. 570. A subsidiary question is whether ice may be a food for human consumption. We discuss also the adequacy of the proof to show that the ice manufacturer had reason to believe its ice was going into a product for human consumption, and that it was prudent for the processor-middleman to recall and destroy two, rather than one, days' production.

On the underlying question, the facts are simple. Southern Ice Company manufactured ice. It sold snow ice to Crossland Ice Service who in turn sold it to Gladiola Biscuit Company who used the snow ice in reducing the temperature of the dough in the manufacturing of frozen (uncooked) biscuits. Thus, there was no privity of contract between the ice company and the biscuit company.

On the basic issue we consider the District Court was wrong. Apparently it thought that the recent and somewhat ambiguous decision of Bowman Biscuit Co. of Texas v. Hines, 1952, 151 Tex. 370, 251 S.W.2d 153, as it underwent its various tergiversations, indicated a retreat by Texas from the position which some thought advanced, but which Chief Justice Alexander, for the Supreme Court of Texas, thought merely reflected the liabilities which the law had long imposed since 1266 A.D. We see nothing in Bowman to detract from Decker. Nor does it, standing alone, or in conjunction with decisions of the Courts of Civil Appeals, reveal a purpose to retract or constrict the philosophy which Decker set forth.

In a day when many are apprehensive of any express acknowledgement of the role of the judiciary as a maker of public policy, we are on sound ground in looking upon it in those terms in this field. For not less than 12 times in Decker and 14 times in Bowman the Supreme Court of Texas discussed it in those very words.

Since Texas puts the rule of liability without fault on the basis of public policy, it is ripe to ask: what is that policy? It is not, as the manufacturer here contends, merely to allow an injured party to sue one not in privity. The right to sue is but a sanction to give effective expression to the policy. It is a redress which the law affords to compensate as best the law might. But what the law allows as legal compensation is by no means thought of as complete or adequate compensation in every situation. Indeed, the law recognizes that there may be consequences for which the legal remedy is the best that can be safely fashioned, although still inadequate. For example, for serious and permanent damage to one's digestive system from deleterious products, the law might affirm the allowance of large damages. But the judgment and its payment would not eradicate the pain or suffering or the disability flowing from it. Nor would, for example, a large recovery take the place of the life lost by such an occurrence. The public policy behind this doctrine is then the protection of Texas citizens from the injurious consequences of deleterious foods and beverages.

The expression of this concern was made in the contemporary setting which had to take into account the fact that unless the heavy duty were placed on the producer, protection of the public health and physical well-being would suffer. Technical rules of sales concerning the fitness of the thing asked for by name or brands, or the implied representation of fitness by a seller would hardly do the job. Today we live in a world of pre-canned, pre-packaged goods. Responsibility, and hence liability, in the Texas view ought therefore to be on the one who has the real control.

In this light, to effectuate · that policy, it is essential to impose on all those supplying ingredients which go into the actual finished product a like burden. Otherwise, while an injured biscuit eater might have his remedy against the manufacturer, or for that matter perhaps against the supplier of the deleterious ingredient as well, the physical harm which Texas seeks to prevent would have irretrievably occurred. Nor would the manufacturer's conceded right to implead the supplier of the deleterious ingredient eradicate the harm. The ingredient must be wholesome and fit for human use as it finds its way into the finished product or the supplier of that ingredient, like the one producing the end product, must bear the consequences. As in the case of the finished product, this burden, while heavy, is deemed reasonable and bearable. The purpose of the rule is to exact not reasonable care but positive fitness. The one who produces the ingredient, equally with the one who produces the end product, has the means, though onerous, of control.

Bowman needs little discussion. In its majority opinion which had lately been the minority, and its dissent which had briefly carried the imprimatur of law, the Court finally concluded that an innocent wholesaler of a packaged food who has no · control over the manufacturing process should not bear this heavy toll. In arriving at this some may think that, despite the disavowal of Justice Wilson's pivotal concurrence, the Court effectually repudiated its earlier decision of Griggs Canning Co. v. Josey, 1942, 139 Tex. 623, 164 S.W.2d 835, 142 A.L.R. 1424, announced the same day with Decker, which imposed this liability on a retailer.

The other cases warrant even less comment. Brown v. Howard, Tex.Civ. App.1955, 285 S.W.2d 752, error refused n. r. e., was not the case of food for man or beast. It was insecticide designed to kill. Eaten by a cow it did just that, and the Court holds that there was no liability. Jax Beer Co. v. Schaeffer, Tex.Civ.App.1943, 173 S.W.2d 285, error refused want of merit. There it was a beer bottle that broke injuring a waiter in a retail store. It was not the contents but the container which failed. See also Anheuser-Busch, Inc. v. Butler,

Tex.Civ.App.1944, 180 S.W.2d 996, no writ history.

Texas cannot be assured food fit for Texans unless those who package it, and those who furnish its essential ingredients, supply the items fit for consumption. Failure by either imposes liability without fault for damages resulting from noncompliance.

■ On this principle of law, the findings implicit in the jury's verdict for the plaintiff Biscuit Company fully sustain a judgment for the processor-middleman. We agree with the District Court that the evidence amply supported the jury's conclusion that the glass found in the biscuit dough and in one or more bags of snow ice was in the ice at the time the ice was delivered by the manufacturer to the distributor-dealer who in turn sold it to the Biscuit Company. We think, as well, that to the extent required under the Decker principle— which extent we do not determine, cf. Houston Cotton Oil Co. v. Trammell, Tex.Civ.App.1903, 72 S.W. 244, reversed on other grounds, 96 Tex. 598, 74 S.W. 899; 37A Tex.Jur., Sales § 163 (1957) —there was adequate evidence that the ice company knew that the ice was being furnished for use in food processing. Two shipments of 15 100-pound sacks of snow ice were picked up daily by the distributor dealer. The delivery tickets, on the form of the Ice Company, were receipted by the Biscuit Company. The dealer assigned his delivery tickets to the Ice Company and the Biscuit Company remitted direct to the Ice Company for all of the snow ice supplied. The Ice Company, as requested, had also undertaken to furnish canvas tops to the canvas bags, thus reflecting an awareness that cleanliness was essential. Especially is this so in the setting of this record which does not indicate any possible use for snow ice by Gladiola Biscuit except in close contact with its food preparation activity.

■ We scarcely pause to affirm the obvious fact that amongst American consumers, ice, if not a food in the sense of a nutritive item, must at least be regarded as a commodity for human consumption, with the heavy obligations incident to it, when it is reasonably to be expected that it will find its way into water or beverages or in, or in contact with, food for consumption.

■ That leaves only the question of the sufficiency of the evidence to warrant destruction of one of the two days' production of biscuits as a precautionary move to eliminate the risk of damage to the consuming public. On this issue the Ice Company acknowledge that an allowance of $2,966.29 for biscuits and dough produced and destroyed on Thursday, September 5, 1957, was justified. It challenges only the balance of the $6,096.15 verdict which includes some of the loss or cost from recall and destruction of most of the production for Wednesday, September 4. The Biscuit Company's evidence would have supported a figure of $12,519.44 for Wednesday, September 4. The jury therefore made substantial adjustments.

Snow ice is mixed in with the ingredients of the dough to reduce its temperature to permit processing and packaging as frozen biscuits. In accordance with the standing order, 15 100-pound sacks were delivered at about 4:00 a. m., Thursday, September 5. On the preceding day, Wednesday, September 4, a total of 30 100-pound bags had been routinely delivered, some of which had been used in the operations of the two shifts on Wednesday. After delivery of the 15 sacks on Thursday morning, there were 20 to 24 bags of snow ice on hand. In the storage vault there was no way to distinguish between Wednesday's ice and Thursday's ice.

On Thursday morning, September 5, a piece of glass was found in the dough. The remaining portion of the bag of ice then being mixed in the dough was examined and glass was found in that bag. Another bag was melted down and a piece of glass found. On September 6

a chemist melted five other bags and one piece of glass was found. On September 9 (the following Monday), another 6 bags were melted down, and a further piece of glass was found.

The jury could thus conclude that glass was found in both Wednesday and Thursday ice, or that, glass being found in at least four bags, the identity of which could not be fixed with specific accuracy out of the 20 to 24 bags comprising Wednesday and Thursday ice, it was reasonable for the Biscuit Company to recall and destroy the production of both days. The Court's charge carefully instructed the jury—to which no exception was taken—that it should determine whether, in the light of the absolute liability imposed on a manufacturer of food stuff, the Biscuit Company after discovering the glass acted as a reasonably prudent manufacturer and distributor of food products in recalling or destroying these products. There was no way to test either Wednesday or Thursday production. The Biscuit Company could have taken a chance. But the risks in money were high and in terms of human life and well-being were fraught with unpredictable severity. With a supervening duty to the eating public and to the non-complying supplier to prevent avoidable consequences, see Southport Transit Co. v. Avondale Marine Ways, Inc., 5 Cir., 1956, 234 F.2d 947, 951–954; McCormick, Damages, Ch. 5 (1935), it was the province of a Texas jury to conclude that to effectuate the Texas policy on protecting Texas consumers, it was prudent for the Biscuit Company to incur the loss allowed for Wednesday's as well as Thursday's biscuits.

Judgment ought therefore to have been entered in favor of the Biscuit Company on the jury verdict and to effectuate that the cause is reversed and remanded with directions.

Reversed and remanded with directions.